**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **CORETTA STEWART,** | : | Case No. 1:05cv0022 |
| | : | |
| Plaintiff, | : | **JUDGE KATHLEEN O'MALLEY** |
| | : | |
| v. | : | |
| | : | |
| **FIRSTENERGY CORP.,** *et al.* | : | **ORDER** |
| | : | |
| Defendants. | : | |

This matter arises on *Defendants' Motion for Summary Judgment* (Doc. 15), in which Defendants seek to enforce a release that they argue bars Plaintiff's ability to pursue this action. Plaintiff filed an opposition (Doc. 21) and Defendants filed a reply (Doc. 22). Defendants also filed "supplemental authority" – *i.e.*, a decision granting summary judgment based on the release at issue in this case (Doc. 23). Plaintiff filed a brief response arguing that the "supplemental authority" presented is distinguishable on its facts (Doc. 24).[1] This matter is, therefore, ripe for determination.

The issue presented relates to the impact of a release executed by Plaintiff. If enforceable, and as broad as the Defendants claim, the release bars the claims Plaintiff asserts in this case. The issue is, therefore, discrete and was acknowledged at the Case Management Conference as a threshold issue. As a result, the Court allowed only limited discovery so as to enable the parties and the Court to consider the issue prior to engaging in lengthy and costly discovery on the merits of this case (*see* Case

---

[1] For the most part, Plaintiff is correct. Based on its facts, *Mesaros v. FirstEnergy Corp*. (Case No. 5:04cv2451) is not directly applicable to this case. It is relevant, however, in that it demonstrates one court's view that the *Agreement to Release in Full* at issue here is generally both valid and enforceable.

Management Plan, Doc. 12). The Court addresses, therefore, only the limited facts relevant to its determination of the enforceability of the release at issue.

**I.     BACKGROUND**

Plaintiff worked for Defendants Cleveland Electric Illuminating Company ("CEI") and Centerior Energy ("Centerior") for several years until Defendant FirstEnergy Corp. ("FirstEnergy") was created from the merger of those companies and non-party Ohio Edison Company ("Ohio Edison"). As a result of that merger, a reduction in force ("RIF") occurred in January of 1998, whereby a number of employees were fired. Pursuant to the RIF, Plaintiff was fired on or about January 29, 1998. Plaintiff believes that she was selected for the RIF because she had, during the prior year, complained to the company about alleged mistreatment by her supervisor.[2]

In early February of 1998, Plaintiff met with a FirstEnergy representative for an exit interview. During that interview, the representative presented Plaintiff with an *Agreement To Release In Full* ("Agreement") (Doc. 11).[3] In sum, the Agreement outlined a severance package that included, among other things:

1)     a severance payment of $8,116.00 (pre-tax) from the Company to Plaintiff;

2)     a broad release and covenant not to sue by Plaintiff in favor of the Company;

---

[2]     Plaintiff had not filed charges with either the EEOC or OCRC prior to the RIF, but had written to management personnel claiming that her supervisor was abusive.

[3]     Pursuant to the Agreement, references to the "Company" refer to FirstEnergy, CEI and Centerior, as well as those companies' directors, officer, agents, representatives, employees, successors and assigns. Accordingly, the Agreement, if enforceable, relates to all Defendants in this case, including the individual Defendants who are acknowledged in the Complaint as "employees, agents and/or other representatives of the Employer Defendant." Doc. 1-2 at ¶ 3. The "Employer Defendant" refers to FirstEnergy, CEI and Centerior. Doc. 1-2 at ¶ 2.

    3)      a promise by Plaintiff to repay all costs incurred by the Company in defending a claim asserted by Plaintiff in violation of the release; and

    4)      a promise by Plaintiff to repay the severance benefits to the Company if Plaintiff challenged the validity of the Agreement.

The Agreement further provided that Plaintiff would have forty-five (45) days to consider it and, in the event she accepted, seven (7) days thereafter to revoke her acceptance. It also advised Plaintiff that she had the right to consult an attorney and instructed that, if executed, Plaintiff would be representing that her execution was based on the Agreement alone, and not "representations, written or oral, other than those contained in [the] Agreement."[4]

Plaintiff testified at her deposition that she was not pressured by anyone to sign the Agreement, and that, though she could not recall exactly when she spoke with an attorney, she did obtain legal counsel <u>before</u> signing it. Ultimately, Plaintiff signed the Agreement on August 13, 1998, but only after certain related events that give rise to the present dispute.

Initially, Plaintiff refused to sign the Agreement. Instead, in April of 1998, she filed the first of two charges with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC") (Charge No. 220980618 – the "618 charge"). In the 618 charge, she alleged gender discrimination, sexual harassment and retaliation (for reporting sexual harassment), all in violation of Title VII of the Civil Rights Act of 1964. She also acknowledged the Agreement and alleged that it violated "statutes enforced by the EEOC."

On July 2, 1998, in connection with a separate case wherein the EEOC sought to enjoin FirstEnergy from enforcing the Agreement because certain of its provisions arguably violated various

---

[4]     *See* Section 3, paragraph E of the Agreement (Doc. 11).

federal statutes,[5] United States District Court Judge Donald Nugent issued an order (the "Order" or "Judge Nugent's Order") purporting to "clarify" certain of the Agreement's terms.[6] In part, the Order provided:

> (1) No part of the [Agreement] shall be interpreted to mean that an individual who signs the Agreement is **prohibited from filing a charge** of alleged discrimination pursuant to . . . Title VII . . . the EPA . . . the ADA . . . and the ADEA (as amended by the Older Workers Benefit Protection Act).
>
> (2) No part of the [Agreement] shall be interpreted to mean that an individual who signs the Agreement is **prohibited from providing information for or participating as a witness in an investigation** undertaken by or a proceeding initiated by the [EEOC] pursuant to any of the statutes cited [above].
>
> (3) . . . No part of the [Agreement] shall be interpreted to mean that an individual who signs the Agreement is required to repay severance benefits previously received from [the Company] **if he/she files a charge of alleged discrimination with EEOC or participates in an EEOC investigation or proceeding**.
>
> (4) No part of the [Agreement] shall be interpreted to mean that an individual who signs the Agreement is required to pay [the Company's] costs for attorneys' fees **if he/she files a charge of alleged discrimination with EEOC or participates in an EEOC investigation or proceeding**.

(Emphasis added). The Order also provided that any individual who was terminated on January 29, 1998 under the Company's RIF who had not signed the Agreement as of the Order's issuance date

---

[5] The EEOC identified the following statutes in its action against the Company: Title VII of the Civil Right Act of 1964 (as amended), the Age Discrimination in Employment Act ("ADEA"), the Older Workers Benefit Protection Act ("OWBPA"), the Equal Pay Act ("EPA") and the Americans with Disabilities Act ("ADA").

[6] *See Equal Employment Opportunity Commission v. FirstEnergy Corp.*, Case No. 1:98-MC-19 at Doc. 29.

"shall have sixty (60) days . . . to sign . . . the Agreement." It directed the Company to send a copy of the Order to everyone who had received the Agreement in connection with the 1998 RIF. It further instructed anyone who had questions relating to (1) the Agreement, (2) his/her right to file a charge of alleged discrimination with the EEOC or (3) his/her right to participate in an EEOC investigation or proceeding to consult legal counsel or the Cleveland District Office of the EEOC.

On July 22, 1998, in accordance with the Order, FirstEnergy (*i.e.*, the Company, as referenced above) sent a copy of the Order and the Agreement to the Plaintiff. In light of her exit interview in February of that year, this was the second time she received the Agreement. With those items, FirstEnergy sent a cover letter that, in pertinent part, stated:

> Please be advised that Judge Nugent's Order **does not, in any way, change the Agreement and is consistent with FirstEnergy's intent in using the Agreement** . . . [as indicated], if you have any questions, you should contact your legal counsel or the Equal Employment Opportunities Commission.
> (Emphasis added).

Plaintiff testified at her deposition that she did not recall ever seeing FirstEnergy's July 22, 1998 letter. However, in light of her explicit reference to that letter in her second discrimination charge (further discussed below) – where she alleges that the letter was a further form of retaliation and intimidation – it is apparent that she received, reviewed and understood FirstEnergy's letter.

At some point after receiving the Order, Plaintiff contacted the EEOC to inquire about its effect, if any, on the Agreement. According to her deposition testimony, the only person at the EEOC with whom she spoke <u>regarding the Order and the Agreement</u>[7] was the investigator assigned to her EEOC

---

[7] Plaintiff testified that she spoke to at least two other people at the EEOC, but not about the Order or the Agreement. Accordingly, the Court need not outline the nature of those interactions.

5

charge, Barbara Kramer.[8] Though she was not certain as to the exact time frame, Plaintiff also testified that she spoke with an attorney relative to the Agreement.[9]

With regard to her conversation with Ms. Kramer, the essence of Plaintiff's testimony is that Kramer told her that she could sign the Agreement and still pursue her "case" against FirstEnergy because, according to the Order, she was not "signing away her rights."[10] According to Plaintiff, Kramer told her to "sign for your severance."[11] While the Court trusts that an EEOC investigator understands the difference between an "EEOC charge" and a "lawsuit," Plaintiff testified that Kramer did not articulate that distinction. Noteworthy, however, Plaintiff also testified that Kramer never specifically said that Plaintiff could file a "lawsuit" after having signed the Agreement. At best,

---

[8] With regard to the timing of her conversation with Barbara Kramer, Plaintiff's deposition testimony is uncertain at first; then she indicated that it occurred in July or August of 1998. Clearly, it took place after Plaintiff had all the relevant documents in her possession, however, because she testified that her contact with the EEOC related to reconciling the Agreement and the Order. The exact date, therefore, is unimportant.

[9] At her deposition, and for obvious reasons, counsel did not explore the nature of Plaintiff's conversations with her attorney. Plaintiff testified that she did not have legal counsel in July of 1998 when she got the Order. When asked if she spoke to her attorney at some point between July and August of 1998, she testified that she could not recall. When asked if she obtained legal advice about the Agreement prior to signing it, though, she identified the attorney.

In light of the fact Plaintiff acknowledges that she spoke to an attorney prior to signing the Agreement in August of 1998, the Court concludes that the admitted conversation must have taken place between July and August of 1998. That being the case, it is reasonable to conclude that the legal advice she obtained was provided with consideration given to all the relevant documents – *i.e.*, the Agreement and Judge Nugent's Order.

[10] Stewart Depo. at 10.

[11] Stewart Depo. at 20

Plaintiff testified only that Kramer told her that she could continue with the pending proceedings against the Company – *i.e.*, those before the EEOC. The conversation simply was not precise with regard to terminology, and neither party apparently explored the distinction between a "charge" and a "lawsuit."

On August 13, 1998, about six months after first having seen the Agreement, and in reliance upon Judge Nugent's Order and comments from Barbara Kramer, Plaintiff signed the Agreement. Per its terms, FirstEnergy paid Plaintiff $8,116.00. To date, Plaintiff has never repaid that amount, nor tendered it back to FirstEnergy in connection with the current action.

In late August of 1998, Plaintiff filed a second charge with the OCRC and EEOC (Charge No. 220981608 – the "608 charge"). That charge alleged that FirstEnergy further retaliated against her when it sent her its July 22, 1998 cover letter along with copies of Judge Nugent's Order and the Agreement. In that charge, she asserts that she "felt the issuance of [the] letter was a form of retaliation and intimidation, in violation of [various federal statutes enforced by the EEOC]." As noted previously, this acknowledgment confirms that Plaintiff had seen FirstEnergy's July 22, 1998 cover letter and was aware of its understanding that the Order had a very limited effect on the Agreement.

As noted above, the EEOC had begun an investigation into the FirstEnergy RIF soon after it was initiated in January of 1998. In a series of findings, the EEOC found probable cause to believe that FirstEnergy may have unfairly targeted individuals for the RIF on the basis of age and race, and that the Agreement FirstEnergy required to be signed in return for the receipt of severance payments may violate the law in certain critical respects. Most significantly, the EEOC felt that provisions in the Agreement prohibiting individuals from participating in EEOC processes not only interfered with the lawful authority of that administrative agency, but were inconsistent with provisions of the Older Workers Protection Act, and possibly other federal statutes relating to discrimination. The EEOC expressed

concern, moreover, that the attorney fee and cost repayment obligations under the Agreement were unduly retaliatory in nature. The EEOC's investigation led not only to the proceedings before Judge Nugent – and his July 2, 1998 Order, but to a series of reconciliation efforts involving a host of individual EEOC charges filed by individuals affected by the RIF.

On August 31, 2004, the EEOC finally informed Plaintiff that it would not be pursuing further reconciliation efforts in connection with her charges and would not be filing suit on her behalf; it issued Plaintiff a "Notice of Right to Sue" with regard to both the 618 and 608 charges. Thereafter, on December 8, 2004, Plaintiff filed the present suit alleging claims for race and sex discrimination, retaliation and common law tort. Defendants now seek to enforce the Agreement to bar Plaintiff's claims.

## II. DISCUSSION

The general issue presented by the Defendant's motion is simple: *Does the Agreement operate to bar Plaintiff's claims asserted in this case?* The parties agree that, on its face, the release bars Plaintiff from bringing any legal actions or filing any lawsuits against the Defendants related to her employment or the RIF. Thus, the issue is not whether the release is sufficiently broad in scope to cover the current lawsuit; it is, instead, whether, even if the release purports to bar the claims asserted here, it may validly do so. The Plaintiff asserts that Judge Nugent's Order preserved the right of all employees to pursue discrimination actions like the present one, even upon execution of the release. She asserts, moreover, that, given Judge Nugent's Order and the advice she received from Kramer at the EEOC, she did not knowing ly and voluntarily waive any right to file a lawsuit in connection with the claims of race and sex discrimination and, thus, should not be prohibited from doing so merely because she received what she characterizes as a "paltry" severance payment from FirstEnergy.

Though Plaintiff's counsel makes the irrelevant claim that <u>even he</u> would have believed that the Agreement would not bar any right to pursue Title VII claims <u>in court</u> (Doc. 21 at p. 12), in light of Judge Nugent's Order, *resolution of the present motion does not turn on the general validity of the Agreement itself*. Read in conjunction with Judge Nugent's Order, the Agreement means exactly what it says it means. Both documents accurately use different and precise terminology – *i.e.*, "lawsuit" and "charge." As Judge Nugent's Order makes clear, those provisions of the Agreement that he and the EEOC found unacceptable were the provisions that purported to restrict access to the EEOC and to interfere with the EEOC's investigative authority. Indeed, his more recent decision enforcing the Agreement and barring a legal action in connection with the RIF confirms his view that, as clarified, the Agreement is valid and enforceable.[12]

*Instead, the issue before this Court turns on whether Plaintiff's execution of the Agreement was valid – i.e.*, whether it was "knowing" and "voluntary." Accordingly, the Court's analysis at this point is limited to the facts and circumstances surrounding the Plaintiff's decision to sign the Agreement, and whether her argument that she did not know she was signing away her right to pursue <u>a lawsuit</u> against the Defendants, even if true, is reasonable under the circumstances. The Court **FINDS** that Plaintiff either did know, or should have known, that her execution of the Agreement would forever bar assertion

---

[12] Plaintiff's opposition brief is somewhat inconsistent in articulating the legal issue relevant to the Defendants' motion. At first, it states that Judge Nugent's Order found that the Agreement did not include "waiver of Plaintiff's rights to bring discrimination **charges** based on Title VII." *See* Doc. 21 at p. 1. It also states, however, that FirstEnergy and the EEOC previously agreed that the release "did not waive Ms. Stewart's discrimination **claims.**" *See* Doc. 21 at pp. 6 and 7.

Beyond general references to Judge Nugent's Order, moreover, Plaintiff presents no legitimate arguments in support of her alternative theory that the Agreement (as "clarified") does not waive any rights relative to asserting discrimination claims <u>in court</u>.

in Court of the present claims.

The Defendants argue that Plaintiff knowingly and voluntarily executed the Agreement because: (1) she was given forty-five (45) days to consider the Agreement (ultimately, she had over six months); (2) she consulted with an attorney about the Agreement; (3) the Agreement, in conjunction with the Order and FirstEnergy's July 22, 1998 cover letter, indicated that Plaintiff would be forever waiving her rights to pursue her current claims (and others) in court (as opposed to before the EEOC *via* a "charge"); and (4) she was given $8,116.00 as consideration for the Agreement. Citing a plethora of unrebutted cases, Defendants argue that, as a matter of law, Plaintiff cannot rely on "advice" from EEOC Investigator Barbara Kramer, whether it was correct or not. Alternatively, they argue that, even if Plaintiff could rely on Kramer's "advice," sufficient evidence exists in the record to support the finding that Plaintiff knowingly and voluntarily executed the Agreement in any event. Defendants further point out that the Agreement ironically provides, "I enter into this Agreement knowingly and voluntarily"[13] and "I am relying upon no representations or statements, written or oral, other than those contained in this Agreement."[14]

Plaintiff argues that, based on the language of Judge Nugent's Order and Kramer's purported interpretation of the Order's effect on the Agreement, she did not knowingly and voluntarily execute the Agreement if its meaning was to bar her present claims from ever being brought in court – claims which she administratively initiated after her initial refusal to execute the Agreement in February of 1998, but before executing the Agreement in August of 1998. She also argues that the very existence of the Order – *i.e.*, a "clarification" order – militates against a finding that the Agreement is "clear" on

---

[13] *See* Section 2, sub-section D of the Agreement.

[14] *See* Section 2, sub-section E of the Agreement.

10

its face, and that, despite case law to the contrary, her communications with Kramer at the EEOC should inform the Court's analysis because the Order instructed her to engage in those communications. A federal court order to direct questions regarding the Agreement to the EEOC (and/or counsel), Plaintiff argues, implies the ability to rely on the substance of such communications.

### A. Summary Judgment Standard and Applicable Law

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and, in pertinent part, provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein . . . . The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

The movant, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

11

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

With regard the discrete legal issue presented here, it is well-established that, under particular circumstances, employers and employees may negotiate valid releases of various types of employment-related claims under a variety of circumstances, including those in severance packages. *Adams v. Phillip Morris, Inc.*, 67 F.3d 580 (6th 1995), citing *Runyan v. National Cash Register Corp.*, 787 F.2d

12

1039 (6th 1986). In the Sixth Circuit, as well as others, courts apply ordinary contract principles in determining whether such waivers are valid, remaining alert to ensure that employers do not defeat the policies of the employment-related statutes or common law claims at issue by taking advantage of their superior bargaining position or by overreaching. *Runyan*, 787 F.2d at 1044-45. Separate and apart from analyzing whether a release is inherently invalid, courts often are asked, as here, to determine whether an employee's execution of a release was a legally informed decision (i.e., "knowing" and "voluntary"). To resolve that legal inquiry, courts are to consider:

> (1) the plaintiff's experience, background and education;
> (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the plaintiff had an opportunity to consult with a lawyer prior to signing the waiver;
> (3) the clarity (or lack thereof) of the waiver;
> (4) whether consideration was given for the waiver; and
> (5) the totality of the circumstances.

*Adams,* 67 F.3d at 583. *See also, Bormann v. AT&T Communications*, 875 F.2d 399 (2d Cir. 1989) and *Riley v. American Family Mutual Ins. Co.*, 881 F.2d 368 (7th Cir. 1989).

    B.    <u>Analysis</u>

In light of the unique facts presented in this case, the Court is sympathetic to both sides. On one hand, the Defendants (through FirstEnergy) clearly and legally, with clarification from Judge Nugent, sought to obtain broad releases from the terminated employees to whom severance packages were offered in connection with the reduction in force program. Their willingness to pay out a significant aggregate sum understandably was premised upon the view that the releases are enforceable. A finding to the contrary, especially in light of the fact there is no evidence <u>that the Defendants' conduct</u> impacted the Plaintiff's ultimate decision to sign the Agreement, certainly would produce an inequitable result

as to the Defendants.

On the other hand, it is clear that Plaintiff has always wished to pursue the claims she asserts in this case. That much is clear from the fact she filed her first charge before, and her current claims after, signing the Agreement. The question, however, is whether she knew *or should have known* that signing the Agreement legally would inhibit her desire to pursue her claims in court. Because the Court is obligated to consider the information and advice that was available to inform her decision to sign the Agreement *in conjunction with* the Plaintiff's steadfast desire to pursue her claims – *i.e.*, whether it is reasonable for her to have believed that the Agreement had no meaning – the Court cannot find in her favor.[15]

The first four factors outlined in *Adams v. Phillip Morris, Inc.*, 67 F.3d 580 (6th 1995), clearly cut in favor of a finding that Plaintiff acted knowingly and voluntarily. As to the first factor, though there is little, if any, evidence in the record about Plaintiff's educational and experiential background, Plaintiff argues that she is not sophisticated because she has only a high school education. Notwithstanding the fact that a lack of advanced education does not necessarily make someone "unsophisticated," the letters and memoranda attached to Plaintiff's opposition brief demonstrate that she is sufficiently educated to understand the documents at issue in this case – *i.e.*, the Agreement, the Order and FirstEnergy's July 22, 1998 letter. Plaintiff's memoranda and letters, which outline her repeated complaints about the unprofessional behavior of her supervisor, are detailed, organized and

---

[15] Because Plaintiff's claim is that she did not knowingly and voluntarily enter into the Agreement – or did so based on a material mistake of fact or law regarding its terms – it is arguable (indeed, probable) that her failure to tender back the benefits she received under the Agreement is fatal to her claim, and that judgment should be entered in Defendants' favor on that ground alone. In light of the decisions the Court makes here, however, the Court need not reach that question and declines to do so.

coherent. If anything, they evidence a sufficient level of sophistication to assume that Plaintiff understands even relatively sophisticated concepts articulated in written form.

As to the second factor, there is no dispute that, per the terms of the Agreement, Plaintiff was given forty-five (45) days to review it and seven (7) days to revoke acceptance of it. As it turns out, she effectively had six (6) months to consider the Agreement before she signed it in August of 1998. Further, the Agreement advised her to consult an attorney, which she did.

As to the third factor, the Court finds that the Agreement – when read in conjunction with the Order – is clear. Plaintiff's argument that the Order's mere existence demonstrates the Agreement's lack of clarity is misplaced. Because she signed the Agreement after having received the Order, she cannot attack only the Agreement's clarity; she must consider the documents together. At best, Plaintiff is left with the unpersuasive argument that the Order is unclear. The Order is not unclear, however, and certainly it is not imprecise. It does exactly what the parties purport its intent to have been; it clarifies that preventing individuals from 1) filing "charges" with the EEOC, or 2) participating in EEOC investigations (or proceedings) is not the aim of the Agreement. The Order's consistent use of the term "charge" in the provisions describing what the Agreement did not mean is clear and accurate. Though the Court admits that, with minimal effort, the Order could have more thoroughly highlighted this distinction, its failure to do so does not render it "unclear." This is especially true in light of the fact Plaintiff was advised to consult with, and did consult with, an attorney before signing the Agreement.

As to the fourth factor, Plaintiff clearly received consideration for signing the Agreement. She was given $8,116.00. Surprisingly, Plaintiff's view is that she gave the Defendants nothing in return – *i.e.*, that the Agreement's restrictive provisions meant absolutely nothing. No reasonable employer would offer a soon-to-be terminated employee a severance package without expecting written

15

assurances it receives in return to be enforceable. An interpretation to the contrary simply is unreasonable. Plaintiff's contrary argument – that the severance package was not true consideration for the release – also is unavailing. While she asserts that "after taxes" she received only a small sum, whatever sum she received was still over and above that otherwise due her for the hours she worked prior to her discharge. The Court is to assess the fact of consideration, it is not to weigh its value. *Mooney v. Green*, 4 Ohio App. 3d 175, 177 (12th Dist. 1982).

Accordingly, the fifth factor – the catch-all "totality of the circumstances" factor – is the only factor under which the Plaintiff reasonably can argue she did not act knowingly and voluntarily. Only two facts relate to this factor: 1) Judge Nugent's Order instructed Plaintiff to direct questions regarding the Agreement (and the Order) to the local EEOC office; and 2) EEOC Investigator Barbara Kramer allegedly led Plaintiff to believe that signing the Agreement would not result in a waiver (of any kind) of the present claims.

Despite Defendants' unrebutted citation to cases standing for the proposition that the receipt of bad advice from the EEOC can never render a decision "unknowing" or "involuntary," the Court concludes that those cases arguably are distinguishable on their facts because the Plaintiff here was *instructed* by a federal judge to direct her questions to the EEOC. The Order, accordingly, gives some added weight to the EEOC's responses on that topic and to the issue of whether reliance on those responses was reasonable. Of course, the Order also instructed Plaintiff to direct questions to counsel (which she did), which presumes that the Order contemplated that any inaccurate information from the EEOC ultimately would be evaluated by counsel. Were courts routinely to invalidate releases based on bad "legal" advice, however, far too few releases would survive. Be that as it may, under the facts of this case, the Court considers and weighs the Plaintiff's communications with the EEOC.

16

The only evidence presented that relates to the Plaintiff's conversation with the EEOC is her deposition testimony, which the Court accepts as unrebutted, <u>but less than clear</u>. Though Plaintiff admitted that Kramer never said the Plaintiff could file a "lawsuit" after signing the Agreement, she points out that Kramer did not explain the difference between a "charge" filed with the EEOC and a "lawsuit" filed in court. The only consistently clear articulation of what Kramer actually said – which is wholly separate from what Plaintiff may have interpreted Kramer's statements to mean – is that Plaintiff "could still pursue [her] **case** and [she] would not be givin' up [her] rights." *See* Stewart Depo. at p. 10 (emphasis added).[16]

As an initial matter, it is difficult to believe that Kramer does not understand, or at least failed to observe, the distinction between an "EEOC charge" and a "lawsuit," especially when responding to questions in connection with a federal court order that clearly, and repeatedly, used the term "charge" when explaining the agreed-to limitations of otherwise clear provisions in the Agreement. Though Plaintiff does not exactly take the position that Kramer does not know the difference, her testimony certainly implies that to be the case. Regardless, Kramer's statements (even as recollected by Plaintiff), though less than precise, are not inaccurate. Plaintiff had already filed the 618 charge by the time she spoke with Kramer. Indeed, Kramer was the investigator assigned to that case. Accordingly, Kramer's statement that Plaintiff could pursue her "case" even if she signed the Agreement could just as easily

---

[16] In response to the question "Do you know if she was talking about <u>your Charge</u>, that your Charge would continue ahead, even if you signed the Release?" Plaintiff testified, "Yes, she said I can still pursue <u>the Charges</u> that I had already filed." *See* Stewart Depo. at p. 10-11 (emphasis added).

Upon further questioning on the distinction between a "charge" and a "lawsuit," however, Plaintiff settled on the recollection that the essence of what Kramer told her was that she could continue to pursue her "case" against FirstEnergy.

17

be interpreted to mean that Plaintiff could continue with her already-filed EEOC charge, as well as any others she might file, which she later did in August of 1998.

While there is some dispute over the precise content of the conversations the parties agree that Kramer never expressly told Plaintiff she could file a lawsuit in this (or any) Court, and never told Plaintiff that the release provision of the Agreement was essentially meaningless. In light of the ambiguous nature of this exchange, the Court finds it significant that Plaintiff had sufficient alternative information available to her to prevent naked and unreasonable (under the circumstances) reliance on that conversation. As noted previously, Plaintiff consulted an attorney. Though the timing of that consultation is unclear, Plaintiff testified that it occurred prior to her execution of the Agreement. Though the details of that consultation are confidential and need not be disclosed, it is telling (though not determinative) that Plaintiff did not volunteer them as further support of Kramer's – and, by extension, Plaintiff's – purported interpretation of the Agreement (as clarified). Perhaps the details simply do not support that interpretation.

Further, along with the Order, Plaintiff received a letter from FirstEnergy indicating that the Order "does not, in any way, change the Agreement and is consistent with FirstEnergy's intent in using the Agreement." Though Plaintiff claimed she did not recall ever seeing FirstEnergy's letter, that very letter serves as the basis for the second charge she filed with the OCRC and EEOC (the 608 charge). This alone calls into question Plaintiff's credibility and/or recollection, either of which militates in Defendants' favor.

Clearly, Plaintiff was on notice that FirstEnergy was under the impression that the applicability of the Agreement was not materially changed by Judge Nugent's Order – a view that is completely at odds with Plaintiff's purported belief that the Order rendered various provisions of the Agreement

18

meaningless. Even were Plaintiff to have disregarded FirstEnergy's comment as being "self-serving," she cannot claim, as she does, that *everyone* understood the Agreement to have no meaning. That is not what Judge Nugent's July 2, 1998 Order said (and, as reflected in his later decision), it is not what Judge Nugent now believes, it certainly is not what FirstEnergy said it believed when it forwarded the Agreement to the Plaintiff after it was clarified by Judge Nugent's Order, and it simply is not what the Agreement says (when read in conjunction with the very precise language of the Order).

Under the totality of the circumstances, the Court **FINDS** that Plaintiff knowingly and voluntarily executed the Agreement, and that the Agreement, as clarified, bars the claims she asserts in this case.

### III. CONCLUSION

For the foregoing reasons, *Defendants' Motion for Summary Judgment* (Doc. 15) is **GRANTED** and Plaintiff's case is **DISMISSED**.

In light of the Court's ruling, all that remains is Defendants FirstEnergy, CEI and Centerior's (the "Counterclaiming Defendants") Counterclaim (Doc. 13). Pursuant to Section 3, subsections (G) and (H) of the Agreement, that Counterclaim seeks 1) reimbursement for all costs, including attorneys' fees, incurred in defending this action (because Plaintiff asserted, in court, a claim that was released by the Agreement), and 2) repayment of the $8,116.00 (plus interest) severance money paid to Plaintiff (because Plaintiff challenged the validity of the Agreement). While the Court has serious questions as

to the applicability[17] and enforceability[18] of those particular provisions, resolution of those issues at this time would be premature.

**Within ten (10) days of the date of this Order**, the Counterclaiming Defendants shall file a "Notice" indicating whether they intend to pursue their Counterclaim. If they wish to pursue it, they **SHALL CONFER** with Plaintiff and the parties **JOINTLY SHALL PROPOSE** a date for a Status Conference **to occur in May 2006**, at which the Court will address how this case will proceed. If they do not wish to pursue it, the Court will look forward to a dismissal entry reflecting that intent.

**IT IS SO ORDERED.**

s/Kathleen M. O'Malley
KATHLEEN McDONALD O'MALLEY
UNITED STATES DISTRICT JUDGE

**Dated: March 29, 2006**

---

[17] With regard to the provisions' *applicability*, it is unclear whether: 1) Plaintiff has actually challenged the "validity" of the Agreement, as opposed merely to challenging its enforceability against her based on her misunderstanding of its terms; and 2) the Counterclaiming Defendants actually defended against the released claims asserted in Plaintiff's Complaint, given that the merits of those claims will never be reached.

[18] With regard to the provisions' *enforceability*, it is possible, as the EEOC itself opined, that they are unconscionable and/or inconsistent with public policy. With regard to the provision that requires reimbursement of defense costs, the unconscionability argument is especially relevant in light of the relatively small size of the severance (*i.e.*, $8,116.00). This assumes Plaintiff is permitted to keep the severance money, which the Counterclaiming Defendants likely will challenge under subsection (H). Obviously, if the severance money is ordered to be returned, the unsciounability argument as to "costs" is enhanced.